**SO ORDERED.**

**SIGNED this 29 day of October, 2013.**

*Stephani A. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE  DIVISION

IN RE:                                                                    CASE NO.

**ARVE ANGELL ENG,**                                       **13-02195-8-SWH**

**DEBTOR**

### ORDER

The matter before this court is the motion of Petromax NC, LLC, and Petromax Retail NC, Inc. ("Petromax") to prohibit debtor's use of cash collateral or for adequate protection filed on June 5, 2013.  The debtor filed a response to the motion and following a telephonic hearing on July 11, 2013, an interim order conditioning the use of cash collateral and providing adequate protection for Petromax through August 29, 2013, was entered on July 18, 2013.  The parties were unable to agree to an extension of the interim order and a hearing on the motion was held on September 11, 2013, in Raleigh, North Carolina, after which, the court allowed each party to submit post-hearing briefs.  Petromax and the debtor have each submitted briefs and the matter is now ripe for consideration.

This case involves a deed of trust on the debtor's land which contains an assignment of rents clause.  The debtor is the sole shareholder and president of a corporate entity that operates a business

on the land.  The issue before this court is whether the creditor can claim all of the profits produced by the corporate entity, or at least a portion of the funds attributable to rent payments, as cash collateral.

## BACKGROUND

In June of 2010, the debtor purchased two gas stations with operating convenience stores onsite in Pitt County, North Carolina, from Petromax, one located in Chicod and the other in Grimesland, North Carolina ("Chicod and Grimesland Stores").   In connection with the sale, the debtor executed a purchase money promissory note in favor of Petromax in the amount of $2,000,000 ("$2,000,000 note").

The debtor's obligation under the note was secured by a deed of trust granting Petromax a security interest in the real property and improvements and fixtures at the gas stations.  The deed of trust evidenced a second priority lien on the Chicod Store, behind a prior encumbrance in favor of East Carolina Bank, and a first lien on the Grimesland Store. The deed of trust also contained an assignment of rents clause, under which Petromax was entitled to all rents and emoluments from the premises.

Within days of purchasing the gas stations, the debtor formed Olia Operations, Inc. ("Olia") to operate and manage the gas stations.  Debtor is the sole shareholder, sole director and president of Olia.  Debtor testified that he works for Olia, tending to financial, personnel and other management responsibilities and draws from Olia's net profits, if available, approximately $4,500 per month as compensation.  Olia employs between 18 and 20 people.  No lease or any other type of agreement was ever formalized between the debtor and Olia.

At some point in late 2010 or in early 2011, the debtor defaulted on the $2,000,000 note.  On April 4, 2013, the debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Petromax filed a proof of claim for $2,463,751.55, representing the remaining balance on the note.  The debtor valued the gas stations, collectively, at $1,300,000, in his schedules.

In his original statement of financial affairs filed on April 18, 2013, the debtor listed receiving $80,280 in "rent" in 2011, $74,690 in "rent" in 2012, and estimated receiving $10,000 in "rent" in 2013 under "[i]ncome other than from employment or operation of business." Additionally,  the debtor listed receiving $3,900 in 2011, $0.00 in 2012 and estimated receiving $0.00 in 2013 under "[i]ncome from employment or operation of  business."  In an amendment to the statement of financial affairs filed on July 2, 2013, the debtor re-characterized the monies originally indicated as rent receipts, as management fees.

## DISCUSSION

The debtor operates the gas stations through Olia, and pays himself directly from the corporation's profits.  It is Petromax's contention, first, that all of the income produced by Olia in the operation of the gas stations are rents and emoluments from the premises, in which Petromax has a security interest, and which therefore constitute cash collateral under 11 U.S.C § 363(a). Alternatively, Petromax claims that certain funds flowing to the debtor from Olia should be characterized as rental payments and that these rental payments are cash collateral.  Petromax asserts that the debtor may not use this cash collateral without its consent or authorization by the court pursuant to 11 U.S.C. § 363(c)(2).  In contrast, the debtor contends that none of the monies generated by Olia are Petromax's cash collateral.

3

The parties agree that the deed of trust contains an assignment of rents clause which is valid and enforceable under North Carolina law, N.C. Gen. Stat. 47-20(c) (2013), and that the deed of trust was duly executed and recorded in June of 2010, well before the debtor's petition date.

Section 552(b) provides that a pre-petition security interest in rents will extend to post-petition rents, and thus can serve as cash collateral, to the extent provided for in the security agreement. See 11 U.S.C. §§ 363(a), 552(b); In re Smithville Crossing, LLC, No. 11-02573, 2011 WL 5909527 at *10 (Bankr. E.D.N.C. 2011). Thus, the post-petition rents from debtor's property serve as security for the creditor's loan and are cash collateral.

Up to this point in the analysis, the parties are not in disagreement. The point where they part ways relates to what constitutes "rents and emoluments from the premises" and whether the debtor is receiving any funds from Olia that can be so classified. Petromax asserts that the term "rents and emoluments from the premises" encompasses all of the profits obtained by Olia in the operation of the gas stations because Olia operates on land subject to the deed of trust. In other words, Petromax claims that all of Olia's profits are income derived from the real property because the use of the land is essential to Olia's business. Other courts that have addressed this issue have not given the term "rent" the expansive definition that Petromax asserts.

In Far East Nat'l Bank v. Unites States Tr. (In re Premier Golf Props., LP), 477 B.R. 767 (BAP 9th Cir. 2012), the Ninth Circuit Bankruptcy Appellate Panel was confronted with an assignment of rents agreement which granted the creditor a security interest in any rents, royalties and profits from the land. In determining what revenues amounted to rent, the court noted, ("[i]f the income is produced by the real property, it is considered rents; but if the income is the result of services rendered or the results of the specific business conducted on the property, then it does not

4

constitute rents.") Id. at 773 (citing Zeeway Corp. v. Rio Salado Bank (In re Zeeway Corp.), 71 B.R. 210 (BAP 9th Cir. 1987)).  Based on this analysis, the court held that revenues from greens fees and driving range fees generated by the debtor's golf course were not derived from the land and were instead attributable to services performed on the land and thus, not rents.  Id. at 774.

Other courts that have addressed this issue have come to  similar conclusions. See In re Zeeway Corp., 71 B.R. 210 (BAP  9th Cir. 1987) (gate receipts from racetrack held not to be "rents"); In re Countryside Bowling Ctr., 203 B.R. 765 (Bankr, M.D. Fl. 1996) (revenue of bowling alley was not rent and thus, not cash collateral);  In re Corner Pockets of the Southwest, Inc., 85 B.R. 559 (Bankr. D. Mont. 1988) (income produced by onsite restaurant was not rental income); cf. In re Everett Home Town Ltd. P'ship, 146 B.R. 453 (Bankr. D. Ariz. 1992) (income from the rental of suites at a golf course held to be rents).

Finally, in Mid-City Hotel Assoc. v. Prudential Ins. (In re Mid-City Hotel Assoc.), 114 B.R. 634 (Bankr. D. Minn. 1990), where the creditor held a security interest in the debtor's real property, and under an assignment of rents clause, the rents and profits of the real property,  the court was able to draw a distinction between the revenue generated from room rentals, which constituted rent, and revenues generated from the restaurant and bar, which did not.  Id. at 636, 642.  In so holding, the court noted:

> To be sure, the [restaurant and bar] sales take place on the real estate which is Defendant's security. The real estate itself, its ambience or decor, may enhance the value of the sales to some unquantifiable degree. The fact remains, however, that in generating these revenues Plaintiff is not temporarily assigning out little units from the property interests which constitute Defendant's security, as it is doing in generating its room rates. It is not primarily using the tangible security as the principal means of generating these revenues.

Id. at 642.

Here, Olia's income is not produced by the real property. The only connection between the land and the revenue generated by Olia is that the sale and services occur on the property of the gas stations. That relationship is too attenuated to amount to "rents and emoluments from the premises." To hold otherwise would expand the reach of an assignment of rents agreement to funds not directly related to the property interest underlying the security interest. While it is true that the debtor's gas stations contain certain improvements and fixtures that are necessary for the production of revenue, the improvements and fixtures are not actually producing the revenue; it is the operation of the convenience stores that generates the income. Therefore, the creditors do not have a security interest in and cannot claim as cash collateral *all* of the profits produced by Olia in the operation of the Chicod and Grimesland Stores.

However, this does not end our inquiry. Because the debtor has organized his business such that he is the owner of the gas stations and convenience stores, but Olia actually operates them, the nature of that relationship must be evaluated. If a landlord/tenant or similar relationship is established, then the funds, or a portion of them, flowing from Olia to the debtor would be properly classified as rent and would constitute Petromax's cash collateral.

"Property interests are created and defined by state law," Butner v United States, 440 U.S. 48, 55 (1979), and therefore, the law of North Carolina will determine the nature of the interests of Olia and the debtor in the real property. N.C. Gen. Stat. § 47-20 is the statute that controls the enforceability of assignment of rent clauses. See In re Westchase I Assoc., 126 B.R. 692, 696 (W.D.N.C. 1991). Section 47-20(c) provides that "[t]he recording of a written document . . . containing an assignment of leases, rents, issues, or profits arising from real property shall be valid and enforceable from the time of recording . . ." N.C. Gen. Stat. 47-20(c) (2013). The statutory

6

scheme also defines what the term "rents, issues or profits" shall mean in reference to an assignment of rents, issues or profits.  Section 47-20(b) provides:

> For purposes of this section and G.S. 47-20.1, the following definitions apply:
>
> (1) "Rents, issues, or profits" means all amounts payable by or on behalf of any lessee, tenant, or other person having a possessory interest in real estate on account of or pursuant to any written or oral lease or other instrument evidencing a possessory interest in real property or pursuant to any form of tenancy implied by law, *and all amounts payable by* or on behalf of *any* licensee or permittee or *other person occupying or using real property under* license or *permission from the owner* or person entitled to possession. . . .

N.C. Gen. Stat. 47-20(b) (2013) (emphasis added).   This section gives us insight into *whom* the North Carolina General Assembly understood to be persons paying "rent" for the purpose of an assignment of rents.  Not only are payments from lessees, tenants or other persons having a possessory interest in the real property included in what payments constitute "rent" but so are payments from persons merely occupying or using real property under permission from the owner.

The debtor originally characterized the income he received from Olia as "rent" on his statement of financial affairs.  The amounts the debtor listed receiving as attributable to "rent" were $80,280 in 2011, $74,690 in 2012, and an estimated  $10,000 in 2013.  However, after Petromax filed its motion to prohibit the use of cash collateral, the debtor re-characterized the funds as compensation for the services he provided to Olia for the management of the company.

In evaluating the nature of the payments received by the debtor, certain facts are undisputed: 1) the debtor allowed Olia to operate gas stations and convenience stores on his land; 2) the debtor received funds from Olia on a regular basis; 3) the debtor originally characterized the funds he received from Olia as "rents;" 4) the debtor only sought to re-characterize those funds as

management fees after Petromax filed its motion to prohibit the use of cash collateral; and 5) there was never any lease, oral or written, between the debtor and Olia or any other formalized agreement for Olia to compensate or pay rent to the debtor.  These facts alone, even in the absence of a lease or other agreement between Olia and the debtor, provide enough evidence to find that the payments from Olia constitute rent for the purpose of the assignment of rents clause.  The debtor gave Olia permission to use the land, Olia paid the debtor and the debtor categorized these payments as rent.  Pursuant to N.C. Gen Stat. § 47-20(b)(1), these payments constitute rent for the purpose of an assignment of rents agreement.  The debtor's re-characterization of these payments as management fees after the filing of Petromax's motion to prohibit use of cash collateral is given considerable less weight since the nature of the payments was the impetus for Petromax's motion.  Therefore, some portion of the payments made from Olia to the debtor are Petromax's cash collateral.

Inasmuch as the debtor has sole control over the amount of funds paid by Olia to him, it will be necessary to define a standard amount or formula to determine what portion of Olia's income will be attributable to rent, and hence Petromax's cash collateral.  Otherwise, the debtor is left to determine how much of the net profits he will draw from for his "rent payment" for any particular month, thus affecting the monthly cash collateral.

The debtor introduced the only testimony regarding the formula utilized in the gas station and convenience store industry for determining standard rental rates.  He testified that rent in the industry is typically calculated at 1% of gross income. In debtor's Related Entities Report, Docket Entry No. 31, Olia's profit and loss statement for the months of January through December, 2012, indicates that its gross income for the year of 2012 was $5,430,237.88. Id., p. 4.  One percent of that figure would place Olia's rental rate at $54,302.37 per year, or $4,525.20 per month.  This is

consistent with the debtor's own testimony that he historically received, on average, $4,500 per month from Olia in "rent" payments. The court will therefore set the rent component of the funds generated by Olia's operations in the amount of $4,500 per month and such rent payments shall constitute Petromax's cash collateral.

Pursuant to § 363(c)(2), the debtor may not use $4,500 of the revenue produced by Olia unless given consent from Petromax or authorized by this court. 11 U.S.C. § 363 (c)(2) (2013). The court cannot, with the record before it, determine whether Petromax's interest in its collateral would be adequately protected if the use of it were authorized. Although the debtor has presented some evidence on the costs of insurance and repairs for the Chicod and Grimesland Stores, the evidence is insufficient for the court to determine what costs are actually attributable to the maintenance and preservation of the real property. For example, the debtor claims that the cost to insure the stores is $1,390 per month; however, a review of Olia's January 1 through April 4, 2013, profit and loss statement, contained in debtor's Related Entities Report, (Docket Entry No. 31, p. 7), indicates that "Insurance Expenses" may include operational expenses such as workers compensation insurance. Furthermore, Olia's alleged repair and maintenance expenses are, at minimum, $3,000 every month. A repair bill that is repetitively this high, month after month, may be more indicative of operational expenses than repairs that are necessary to maintain the property. In order for the court to have a more accurate account of the debtor's expenses that directly relate to the preservation and maintenance of the property, the debtor is given ten (10) days from the date of this order to file and serve on Petromax an accounting of the expenses for which it seeks the use of cash collateral. Petromax shall have three days from the receipt of such accounting to consent or object to it. The court will then enter a supplemental order indicating the extent, if any, to which the debtor will be

9

authorized to use Petromax's cash collateral.  Until entry of such order, the debtor is directed to hold $4,500, each month, out of Olia's monthly revenue in trust for the benefit of Petromax, but shall be authorized to disburse to Petromax the sum of $3,000 per month from such sum representing the adequate protection payment provided under previous cash collateral orders.

**SO ORDERED.**

**END OF DOCUMENT**