**SO ORDERED.**

**SIGNED this 25 day of April, 2014.**

_____
Stephani W. Humrickhouse
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:                                                                                    CASE NO.

**ARVE ANGELL ENG**                                                       13-02195-8-SWH

      DEBTOR

### ORDER DENYING CONFIRMATION AND
### GRANTING MOTION FOR RELIEF FROM STAY

The matters before the court are the confirmation of a plan of reorganization filed by the chapter 11 debtor, Arve Angell Eng, and the Motion for Relief from Automatic Stay filed by Petromax NC, LLC, and Petromax Retail NC, Inc. (collectively, "Petromax"). Hearings on Petromax's Motion for Relief from Stay took place on January 6, 2014, and February 19, 2014, and the debtor's confirmation hearing was also held on February 19, 2014, in Raleigh, North Carolina.

At the confirmation hearing, the court addressed the threshold issue of whether the debtor had obtained the vote of a properly impaired class of claims and whether the debtor's chapter 11 plan had been proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3). For the reasons that follow, the court denied confirmation of the debtor's plan due to the debtor's failure to satisfy the good faith requirement of § 1129(a)(3). Because the debtor failed to obtain a confirmable plan, the court granted Petromax's motion for relief from stay, taking under advisement the issue of the scope

of Petromax's relief from stay and upon what property of the estate Petromax was entitled to foreclose.

## BACKGROUND

In June of 2010, the debtor purchased from Petromax two gas stations with attached convenience stores located in Pitt County, North Carolina (the "Chicod Store" and the "Grimesland Store"). In connection with the sale, the debtor executed a promissory note in favor of Petromax in the original principal amount of $2,000,000 (the "Note"). The Note was secured by a deed of trust, granting Petromax a lien on certain real property, including the land upon which the gas stations were located, and a lien on:

> all . . . fixtures, furniture and improvements thereon, and all rights, easements, hereditaments and appurtenances thereunto belonging, including but not limited to all heating, plumbing, ventilating, cooling, and lighting goods, equipment and other tangible and intangible property now or hereafter acquired, attached to or reasonably necessary to the use of such property, the said real and personal property being hereinafter referred to as "premises[.]"

(the "Deed of Trust"). The debtor purchased the Chicod Store subject to a lien in favor of Vantage South Bank; however, pursuant to an agreement entered into between the debtor and Petromax, Petromax was to continue to make payments to Vantage South Bank for the pre-existing lien. Accordingly, the Deed of Trust evidenced a second priority lien on the Chicod Store, subordinate to the Vantage South Bank lien, and a first priority lien on the Grimesland Store.

At some point in late 2010 or early 2011, the debtor defaulted under the terms of the Note and on April 4, 2013, the debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Each of the Petromax entities filed secured proofs of claim in the amount of

$2,463,751.55, representing the unpaid balance on the Note. The debtor valued the gas stations, collectively, at $1,300,000 in his schedules.

On December 5, 2013, the debtor filed his second amended plan of reorganization (the "Plan"). The debtor proposed to fund his Plan through the liquidation of the gas stations and any personal property associated with the gas stations (collectively, the "Business Assets"). The debtor proposed the treatment of eight classes of claims; of importance to this opinion is the debtor's treatment of Class 7. Class 7 consisted of general unsecured claims in an amount less than $5,000, and the only impaired class to cast an accepting ballot came from this convenience class.[1] The debtor estimated that the total claims of Class 7 amounted to $5,760.52 and proposed to pay the class in full through 20 equal quarterly installments, with payments to begin on the earlier of January 15, April 15, July 15, or October 15, following 180 days after the effective date of the chapter 11 plan. The only unsecured creditor within Class 7 to cast a vote was the City of Greenville, which held a claim in the amount of $915.42. Furthermore, the Plan provided that the effective date would be "the later of (i) that date on which the Order Confirming Plan becomes final and non-appealable [and] (ii) the date that the proceeds of the sale of the Debtor's Business Assets have been fully distributed."

Although prior to the confirmation hearing the parties had not briefed the issue of whether Class 7 properly constituted an accepting impaired class and satisfied the good faith requirement of § 1129(a)(3), as recognized by this court in In re Swartville LLC, 11–08676–8-SWH, 2012 WL 3564171 (Bankr.E.D.N.C. Aug. 17, 2012), the court raised the issue *sua sponte* and received

---

[1] Class 4 voted to reject the Plan; Class 5 did not cast a ballot; Class 6 voted to reject the Plan; and Class 8 voted to reject the Plan. Class 2, which was unimpaired, voted to accept the Plan.

evidence and arguments thereon at the hearing. Additionally, Petromax argued in support of its motion for relief from stay that the debtor lacked equity in the gas stations and that its collateral was not necessary for an effective reorganization because an effective reorganization was not in prospect.

## DISCUSSION

### A) Denial of Confirmation of the Debtor's Chapter 11 Plan of Reorganization

Section 1129(a) of the Bankruptcy Code provides a list of requirements that must be met in order for the court to confirm a chapter 11 debtor's plan of reorganization, including, pursuant to § 1129(a)(8), the accepting votes of all impaired classes under the plan. 11 U.S.C. § 1129(a). Alternatively, a debtor may proceed to confirmation even in the absence of accepting ballots from all impaired classes pursuant to § 1129(b)(1) if, among other things, at least one impaired class of claims accepts the plan, and the remaining requirements of § 1129(a) are met. 11 U.S.C. § 1129(b)(1). The policy behind allowing a debtor to obtain a confirmed plan over the objections of some of its impaired creditors is that if another creditor who is impaired does not object to the treatment, that serves as some assurance that the plan is otherwise fair and equitable. See In re Windsor on the River Assoc. Ltd., 7 F.3d 127, 131 (8th Cir.1993) ("The purpose of [§ 1129(a)(10)] is to provide some indicia of support by affected creditors and prevent confirmation where such support is lacking.") (internal quotations omitted); In re 266 Washington Associates, 141 B.R. 275, 287 (Bankr. E.D.N.Y. 1992) ("[B]efore embarking upon the tortuous path of cram down and compelling the target of cram down to shoulder the risks of error necessarily associated with a forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan.").

The proponent of a plan bears the burden of establishing by a preponderance of the evidence that the plan complies with the statutory requirements of § 1129(a). In re Atrium High Point Ltd. P'ship, 189 B.R. 599, 609 (Bankr. M.D.N.C. 1995). Section 1129(a)(3) requires that "the plan has been proposed in good faith." 11 U.S.C. § 1129(a)(3). Although the term "good faith" is not defined in the Bankruptcy Code, "courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the [Bankruptcy] Code." McCormick v. Banc One Leasing Corp. (In re McCormick), 49 F.3d 1524, 1526 (11th Cir.1995) (citing In re Block Shim Development Company-Irving, 939 F.2d 289, 292 (5th Cir.1991); In re Madison Hotel Associates, 749 F.2d 410, 425 (7th Cir.1984); In re Coastal Cable T.V., Inc., 709 F.2d 762, 764-65 (1st Cir.1983)). In determining whether a plan has been proposed in good faith, the court must focus on the plan itself and examine the totality of the circumstances surrounding the plan. In re McCormick, 49 F.3d. at 1526 (citing Block Shim, 939 F.2d at 292; Madison Hotel, 749 F.2d at 425).

This court, in In re Swartville LLC, 11–08676–8-SWH, 2012 WL 3564171 (Bankr.E.D.N.C. Aug. 17, 2012), recognized that the improper impairment of a class of claims can serve as grounds to deny confirmation because such proposed treatment may fail to satisfy the good faith requitement of § 1129(a)(3). 2012 WL 3564171 at *4 ("This court is persuaded by the position espoused by courts who evaluate the significance and degree of impairment in the context of a good faith analysis required under § 1129(a)(3)."). Based on the record and the evidence received by the court at the confirmation hearing, the debtor has failed to carry his burden that his Plan was proposed in good faith.

The impaired classes which rejected the debtor's Plan account for a significant amount of the claims to be paid through the Plan. Petromax asserted a secured claim of $2,463,751.55, and an unsecured claim of $40,000. Vantage South Bank, which did not file a claim in the debtor's case, has a secured claim in the amount of $476,000. Additionally, Fifth-Third Bank, which did not cast a ballot, has a secured claim in the amount of $17,142.88. In order to allow the debtor to base its cram down of these truly impaired creditors, solely upon the acceptance of Class 7, the necessity of the debtor to postpone payment to this class, having a relatively *de minimis* amount of claims and only one voting creditor, will need to be subjected to closer scrutiny.

The claims of Class 7, totaling less than $6,000, represent less than 1/4% of the secured claim asserted by Petromax and an even smaller percentage of the total claims asserted in this case. The debtor proposed to pay this class through 20 equal quarterly installments, which would equate to payments of approximately $100 per month over five years. The only creditor within Class 7 to vote in favor of the plan, or even cast a ballot, held a claim of only $915.42.

The debtor testified at the confirmation hearing that, in January of 2014, after the Plan was already filed, he paid approximately $6,000 to the Pitt County Tax Collector for pre-petition ad valorem taxes. The debtor paid the ad valorem taxes even though this debt was not listed in his Plan and the treatment afforded to the Pitt County Tax Collector, through Class 2, would have allowed the debtor to pay the debt over a five year period. Additionally, the debtor testified at the confirmation hearing that he owned a Scott Trade brokerage account containing approximately $40,000 in cash which was "not spoken for." The debtor further testified that he could have these funds available within two days if he transferred them to his bank account.

Based on the debtor's testimony, it is apparent that the debtor could have used either the $6,000 he paid to the Pitt County Tax Collector or the nearly $40,000 in cash available in his Scott Trade account to satisfy the claims of Class 7 in full. Furthermore, the debtor offered no reason as to why it was necessary to postpone payment to Class 7 or otherwise impair the treatment of that class. Finally, due to the proposed effective date of the Plan, Class 7 would potentially not begin to receive payments until 180 days after the proceeds of the sale of his business assets have been fully distributed. This delay in payment to unsecured creditors is not necessary, illogical and unfair. Therefore, based on the totality of the circumstances surrounding the plan, the court concludes that the proposed impaired treatment of Class 7 was not in good faith. And thus, accordingly, the debtor has failed to carry its burden under § 1129(a)(3) of the Bankruptcy Code. Cram down is not authorized and confirmation must be denied.

**B. Petromax's Motion for Relief from Stay**

Based on the inability of the debtor to obtain confirmation of his second amended plan (i.e., third proposed plan), the court granted Petromax's motion for relief from stay pursuant to 11 U.S.C. § 362(d)(2). See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 376 (1988) (Noting that pursuant to § 362(d)(2) "there must be 'a reasonable possibility of a successful reorganization within a reasonable time'" (quoting In re Timbers of Inwood Forest Associates, Ltd., 808 F.2d 363, 370 (5th Cir. 1987) (en banc))). However, the court took under advisement the issue of what properly constituted Petromax's collateral; and consequently, the scope of the relief granted.

Petromax's security interest is evidenced by, among other things, the Deed of Trust, which grants Petromax a lien on certain real property together with any improvements or fixtures thereon.

7

Although there is no dispute as to what real estate Petromax's lien extends, the parties are in disagreement as to whether certain assets associated with the gas station are fixtures and thus covered within the description of the collateral under the Deed of Trust. The parties agree that Petromax's lien does not attach to any items at the gas stations that can properly be characterized as personal property. The debtor contends that numerous items located on the gas station convenience store properties, including the storage tanks, walk-in coolers and the canopies sheltering the gas pumps, constitute personal property. Additionally, the debtor challenges the sufficiency of the language contained in the Deed of Trust to cover the specific items of property which Petromax claims are fixtures.

There are two methods to perfect a security interest in fixtures under North Carolina law. First, pursuant to N.C. Gen. Stat. § 25-9-502(b), a financing statement may serve as a "fixture filing" if certain requirements are met, including that the financing statement "indicate that it covers this type of collateral." N.C. Gen. Stat. § 25-9-502(b) (2012). Secondly, a "record of mortgage" can be effective as a fixture filing if, among other requirements, "the record indicates the goods or accounts that it covers." N.C. Gen. Stat. § 25-9-502(c) (2012). The parties do not dispute that Petromax's recorded Deed of Trust *can* serve as a fixture filing pursuant to N.C. Gen. Stat. § 25-9-502(c), and thus evidence Petromax's lien on any fixtures described in the Deed of Trust. However, the debtor does challenge whether the language contained in the Deed of Trust satisfies the requirement of § 25-9-502(c)(1) that it "indicate the goods or accounts that it covers" and sufficiently identifies the collateral claimed as fixtures.

Two separate provisions of the Deed of Trust set out that fixtures are included as Petromax's collateral. The first page of the Deed of Trust states, in all caps, that "COLLATERAL IS OR

INCLUDES FIXTURES." Furthermore, on page three of the Deed of Trust in the section which describes the property securing the debtor's obligation, the following language is set forth:

> Together with all timber "standing and cut", [sic] crop allotments, crop contracts, . . . buildings, fixtures, furniture and improvements thereon, and all rights, easements, hereditaments and appurtenances thereunto belonging, including but not limited to all heating, plumbing, ventilating, cooling, and lighting goods, equipment and other tangible and intangible property now or hereafter acquired, attached to or reasonably necessary to the use of such property, the said real and personal property being hereinafter referred to as "premises". [sic]

Although the Deed of Trust, in one location, identified the collateral by the generic term "fixtures," the above quoted language identifies the specific types of property meant to be included in the term "fixture." Furthermore, the language included in the Deed of Trust also satisfies the "notice filing" objective of the Uniform Commercial Code and puts any third-party on notice of Petromax's security interest in any fixtures. See N.C. Gen. Stat. 25-9-502 cmt. 2. Accordingly, the Deed of Trust satisfies the requirements of N.C. Gen. Stat. § 25-9-502 and is effective as a fixture filing.

Such a determination is not dispositive of the issues before the court. The parties still disagree as to what assets constitute fixtures as opposed to personal property. "A fixture has been defined as that which, though originally a moveable chattel, is, by reason of its annexation to land, or association in the use of land, regarded as part of the land, partaking of its character." Wilson v. McLeod Oil Co., Inc., 327 N.C. 491, 515, 398 S.E.2d 586, 598 (1990) (citing Little v. Nat'l Services Indus., Inc., 79 N.C.App. 688, 692, 340 S.E.2d 510, 513 (N.C. Ct. App. 1986)). Several tests have been identified as useful in resolving whether a chattel attached to real property becomes a fixture or remains personal property, including: (1) the manner in which the article is attached; (2) the nature of the article and the purpose for which the article is attached; and (3) the intention with

which the annexation of the article is made. Wilson, 327 N.C. at 515, 398 S.E.2d at 598 (citing Little v. Nat'l Services Indus., Inc., 79 N.C.App. 688, 692, 340 S.E.2d 510, 513 (N.C. Ct. App. 1986)). North Carolina courts apply the test that looks to the intention of the parties at the time the annexation is made. Lee-Moore Oil Co. v. Cleary, 295 N.C. 417, 419, 245 S.E.2d 720, 722 (1978) ("Whether a thing attached to the land be a fixture or chattel personal, depends upon the agreement of the parties, express or implied." (citation omitted)); Little v. Nat'l Services Indus., Inc., 79 N.C.App. 688, 692, 340 S.E.2d 510, 513 (N.C. Ct. App. 1986) ("Under the modern view, the controlling test is the intention with which the annexation is made." (citation omitted)).   See also In re Laurel Hill Paper Co., 393 B.R. 372, 382 (Bankr. M.D.N.C. 2008) (holding the same, applying North Carolina law).

The intent of the party who annexed the chattel to the real property can be determined, "in large measure, by the relationship of the parties to the land and to each other." Little, 79 N.C. App. at 692, 340 S.E. 2d at 513.  When the owner of real property annexes a chattel to the land, a presumption arises that the addition was made to enhance the value of the land and that the chattel becomes part of the real property. Wilson, 327 N.C. at 515, 398 S.E.2d at 598 (citing Little, 79 N.C.App. at 692, 340 S.E.2d at 513).  The burden of rebutting this presumption lies with the party claiming that the annexed chattel did *not* become part of the real estate and thus remains personalty. Little, 79 N.C. App. at 693, 340 S.E. 2d at 514.  However, when the chattel is installed by a tenant, "the law is indulgent and, in order to encourage industry, the tenant is permitted 'the greatest latitude' in removing equipment which he has installed upon the land." Little, 79 N.C. App. at 693, 340 S.E. 2d at 513 (quoting Overman v. Sasser, 107 N.C. 432, 12 S.E. 64 (1890)).

When there is a lack of evidence showing the subjective intent of the parties at the time of annexation, "[t]he manner in which the chattel is attached to the land also provides objective evidence of the intention of the party attaching it." Little, 79 N.C. App. at 694, 340 S.E. 2d at 514. See also In re Laurel Hill Paper Co., 393 B.R. at 382. Similarly:

> [i]f personal property is attached to the real estate and is adapted to the purposes for which the real estate is being used, it will be presumed that the party attaching it intended that it should be part of the real estate, unless a contrary intention appears from the conduct of the parties in relation to it.

Little, 79 N.C. App. at 694, 340 S.E. 2d at 514.

The items claimed by Petromax to be fixtures, but by the debtor to be personal property, are the fuel storage tanks and associated lines, the fuel pumps (along with any associated lines and wiring), the walk-in coolers located inside the convenience stores, the canopies sheltering the gas pumps and the outdoor signage displaying the brand of fuel sold at the gas stations (collectively, the "Disputed Items"). All of these items were installed on the property prior to the debtor's ownership of the gas stations. Indeed, all of the Disputed Items were affixed to the property prior to Petromax's ownership of the property. Additionally, Petromax's principal, Mike Elwan, testified that the gas storage tanks have been on the property since the 1960's or 1970's and throughout the tenure of at least three prior owners. Accordingly, the debtor and Petromax were incapable of offering any evidence as to the subjective intent of the party, or parties, who actually annexed the items to the real property. However, from this chain of possession, it is evident that whomever installed the various items was content to let the items pass through the hands of several owners without voicing an objection or asserting an interest in the items as personal property. This history of ownership of the Disputed Items remaining with the real property owner lends support to

Petromax's argument that the items are fixtures. See Stephens v. Carter, 246 N.C. 318, 98 S.E.2d 311 (1957) (holding in favor of a current owner of real property that fuel storage tanks were fixtures when a prior owner of the real property had attempted to orally convey the tanks as personal property and noting that the tanks had remained on the land throughout the ownership of multiple different parties).

However, the intent of the party, or parties, who installed the Disputed Items is also evidenced by objective indicators tending to show whether the items were or were not to remain a part of the realty. The Disputed Items were attached to the property and adapted for their specific use in a gas station. The fuel storage tanks, the fuel pumps, piping between the tanks and the pumps, and the wiring between the pumps and the convenience store are improvements and structures which differentiate a gas station from an ordinary corner or convenience store. Furthermore, the canopies sheltering the pumps are custom fitted to these two particular gas stations. The gas stations' signage was built for the specific purpose of displaying the brand of fuel sold on the premises. Finally, the walk-in coolers serve as an essential ingredient of the convenience stores. All of these items are adapted to the purpose for which the property is, and historically has been used. Therefore, a presumption arises that at the time of annexation, it was intended that the items were to remain a part of the property.

Additionally, the manner in which the items are attached to the land support a finding that the items are fixtures. The fuels pumps, canopies and outdoor signage are all bolted to poured concrete on the land. The fuel storage tanks, while not underground, vary in size from 10,000 gallons to 4,000 gallons and rest on pedestals attached to a concrete platform. The connections between the tanks and pumps, and the pumps and the convenience store, are all buried

underground. The walk-in coolers are, in essence, well insulated rooms attached to the floor of the convenience store, with their own ceiling and are encased in glass windows. The relative size and manner in which these items are attached to the land are indicative of an intent that they were to remain on the property throughout their useful life.

Taken collectively, based on the length of time the Disputed Items have remained on the property, through several different owners of the gas stations, the adaptation of those items to the purpose for which the property is being used and the manner in which those items are attached to the land, the court must conclude that those items are fixtures and thus serve as Petromax's collateral. Therefore, the relief from stay granted to Petromax in the court's oral ruling encompasses Petromax's right to enforce its security interest against the Disputed Items.

**SO ORDERED**.

**END OF DOCUMENT**